TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JONATHAN GALATZAN (CBN 190414)
Assistant United States Attorney
Chief, Asset Forfeiture Section
    312 North Spring Street, 14th Floor
    Los Angeles, California 90012
    Telephone: (213) 894-2727
    Facsimile: (213) 894-0142
    E-mail: Jonathan.Galatzan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    vs.<br><br>REAL PROPERTY LOCATED AT 14600 INNOVATION DRIVE, RIVERSIDE, CALIFORNIA,<br><br>    Defendant. | NO. 5:17-cv-01875-DMG-SP<br><br>FIRST AMENDED VERIFIED COMPLAINT FOR FORFEITURE *IN REM*<br><br>[18 U.S.C. § 981(a)(1)(A)]<br><br>[H.S.I.] |

    The United States of America brings this first amended complaint against the above-captioned asset, described more particularly below, and alleges as follows:

1

## JURISDICTION AND VENUE

1. This is a civil forfeiture action brought pursuant to 18 U.S.C. § 981(a)(1)(A).

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in this district pursuant to 28 U.S.C. § 1395(b).

## PERSONS AND ENTITIES

4. The plaintiff is the United States of America.

5. The defendant is Real Property Located at 14600 Innovation Drive, Riverside, California, (hereinafter, the "Riverside Warehouse" or "defendant real property"). The legal description of the defendant real property is set out in in Attachment A.

6. As of September 11, 2017, the Riverside Warehouse was titled in the name of Scuderia Development, LLC. Plaintiff is unaware of any other persons or entities with an interest in the defendant real property.

7. *Zhongtian Liu*

    a. Zhongtian Liu, a Chinese national, is the founder and chairman of China Zhongwang Holdings, Limited ("CZW"), one of the world's largest industrial aluminum extrusion companies. Zhongtian Liu controls and is effectively the owner of Perfectus Aluminium, Inc. ("Perfectus").[1]

    b. In May 2009, CZW became publicly listed on the Hong Kong Stock Exchange.

    c. Between 2009 and 2014, in order to fraudulently inflate the value of CZW, Zhongtian Liu and CZW used Perfectus to purchase over $1 billion

---

[1] As detailed below, in paragraph 11(b), in 2014 seven separate entities merged to form Perfectus. In this Complaint, unless otherwise specified, all references to "Perfectus" include Perfectus Aluminium, Inc., Perfectus Aluminum Acquisitions LLC, and the seven predecessor entities.

in aluminum from CZW. CZW falsely disclosed to investors these sales as genuine arms-length party transactions and failed to disclose that Perfectus was owned by Liu, controlled by Liu and CZW, that the sales to Perfectus were made at the direction of CZW, and were financed by CZW. Perfectus was never disclosed as a related party.

    d.    As part of this scheme, prior to 2011, Perfectus purchased aluminum extrusions from CZW. The amount of aluminum Perfectus imported in 2009, the year CZW went public, increased dramatically from 2008. In 2010 and 2011, the Department of Commerce ("DOC") imposed preliminary and then final anti-dumping and countervailing duties ("AD/CVD") of up to 400% on certain aluminum products from China, including, but not limited to aluminum extrusions from CZW. In response to the AD/CVD orders and in order to criminally evade them, between 2011 and at least 2014, Zhongtian Liu and CZW used Perfectus to illegally import approximately 2.2 million aluminum extrusions welded into the form of pallets ("pallets") from China into the United States, as described in detail below.[2] The "pallets" were manufactured by CZW and "sold" to Perfectus by CZW; CZW subsidiaries, including Zhongwang China Investment (HK) Limited, Liaoning Zhongwang Group Company, Limited, and Liaoning Zhongwang Import & Export Company Limited; and several intermediary entities, including Dalian Liwang Trade Co., Ltd., Tianjin Boruixin Co., Ltd. ("Boruixin"); Yingkou Qianxiang Trade Co. Ltd. ("Qianxiang"); and Gran Cabrio Capital Pte. Ltd. ("Gran Cabrio"). These intermediary entities were controlled by Liu and CZW.

    8.    *Zhijie "Jasmine" Wang*

---

[2] The word "pallets" appears in quotes when the reference applies to Series 6 aluminum extrusions cut-to-length and welded together in the shape of pallets. These "pallets" were not marketable or suitable for use as pallets. Rather, they were manufactured as a ruse to avoid paying Customs duties upon importation into the United States.

      a.     Zhijie "Jasmine" Wang ("Wang") is believed to be Zhongtian Liu's wife and is the mother of Zuopeng Liu. Although immigration records reflect that Wang divorced Zhongtian Liu in 1999, the government alleges on information and belief that Wang and Zhongtian Liu are presently married, and that Wang is still commonly referred to by others as "Mrs. Liu."

      b.     California public records reflect that Wang is the agent for Alston International, Inc., and Alston International Investment Group, Inc. (collectively, the "Alston Entities," described more particularly below), and the following LLCs (the "Warehouse LLCs") that hold title to the following real properties where Perfectus harbored and concealed aluminum products, including the bogus "pallets":

      i.     1001 South Doubleday Ave., Ontario, CA (the "Ontario Warehouse"), titled in the name of 1001 Doubleday LLC;

      ii.     2323 Main Street, Irvine, CA (the "Irvine Warehouse"), titled in the name of Von Karman – Main Street LLC; and

      iii.     10681 Production Avenue, Fontana, CA ( the "Fontana Warehouse"), titled in the name of 10681 Production Avenue LLC;

      iv.     14600 Innovation Drive, Riverside, CA (the "Riverside Warehouse"), titled in the name of Scuderia Development LLC.

      c.     At all relevant times, Wang was an authorized signer for at least three separate Perfectus accounts, including Perfectus's payroll account.

9. *Zuopeng Liu*

    a.    Zuopeng Liu is the son of Zhongtian Liu and Wang, and has a son named "Alston," for whom the Alston Entities (discussed below) are believed to have been named.

    b.    Zuopeng Liu incorporated Perfectus in 2014.

    c.    Just prior to the merger of Perfectus's predecessor entities (described in paragraph 11(b), below) in 2014, Zuopeng Liu was listed as an officer for each of the predecessor entities with the California Secretary of State.

    d.    Zuopeng Liu was, for a period in 2014 or 2015, in charge of an entity called Aluminum Shapes, LLC, a privately held company in Delair, New Jersey, registered with the New Jersey Secretary of State ("Aluminum Shapes").

10. *Xiang Chun "Johnson" Shao*

    a.    Johnson Shao ("Shao") is a naturalized United States citizen originally from China.

    b.    From 2004 to 2014, Shao was the principal and manager of Pengcheng Aluminum Enterprise, Inc. ("Pengcheng"). In 2010, Shao testified before the United States International Trade Commission ("USITC") and was introduced by Pengcheng's general counsel, Charles Pok ("Pok"), as Pengcheng's president.

    c.    At various times between 2008 and 2014, Shao was the listed officer/agent for each of Perfectus's seven predecessor entities.

    d.    Shao is believed to have left Perfectus in late 2014 or in 2015 to begin working at Aluminum Shapes. Shao subsequently returned to Perfectus. Shao stated in a declaration filed in this Court (the "Shao Declaration") that he was appointed "manager" of Perfectus in 2016 and oversaw Perfectus's "export program."[3] The export program was an attempt to remove from the United States

---

[3] *Perfectus Aluminum, Inc. v. Sanchez, et al.*, EDCV 16-2640 DMG (SPx), Docket No\. 10-1.

5

the aluminum, including the "pallets", imported into the United States as part of the conspiracy alleged herein. The purpose of the conspiracy was to fraudulently inflate the value of CZW, avoid antidumping and countervailing duties ("AD/CVD") imposed by the United States Department of Commerce (the "Commerce Department") on certain types of Chinese aluminum, including Series 6 aluminum, and move hundreds of millions of dollars through the U.S. financial system to promote these schemes.

11.   *Perfectus Aluminium, Inc. and Perfectus Aluminum Acquisitions LLC*

a.   Perfectus was incorporated in California in December 2014 by Zuopeng Liu. At the time of incorporation, Perfectus's corporate address was the Ontario Warehouse, and its Chief Executive Officer was Zuopeng Liu.

b.   In December 2014, Perfectus Aluminum Acquisitions ("Perfectus Acquisitions"), LLC was formed in Delaware. Perfectus Acquisitions was a wholly-owned subsidiary of Perfectus. In December 2014, seven entities (all co-located at the Ontario Warehouse) merged into Perfectus Acquisitions, including: Pengcheng; Transport Aluminum, Inc.; Century American Aluminum, Inc.; American Apex Aluminum, Inc.; Global Aluminum (USA), Inc. ("Global"); Aluminum Source, Inc.; and Aluminum Industrial, Inc. (collectively, the "predecessor entities"). At the time of the merger, all assets, obligations, and liabilities of the Perfectus predecessor entities were transferred to and assumed by Perfectus Acquisitions.

c.   Until approximately 2011, the main business of the predecessor entities was importing aluminum extrusions, that is, aluminum objects such as bars, tubes, or other parts. Beginning in 2011 and continuing through 2014, however, the predecessor entities (mainly Pengcheng) largely stopped importing aluminum extrusions and instead began importing mass quantities of what were purported to be aluminum "pallets" into the United States from China. In total, the

predecessor entities imported approximately 2,200,000 aluminum "pallets" into the United States from CZW during this period in an effort to avoid AD/CVD.

12. *The Alston Entities*

    a. Wang formed Alston International, Inc. in late 2013, which also did business as Alston Asset Management. Alston Asset Management was, at all relevant times, a property management company used by the Liu family to manage their residential and commercial properties, including the four warehouses that were used to store aluminum extrusions and pallets as part of the wire and customs fraud.

    b. In 2014, Wang formed Alston International Investment Group, Inc.

    c. California employment records reflect that Zhongtian Liu was employed by Alston International Inc. from 2014 to 2017.

    d. During relevant times, Alston used a variety of bank accounts to transact business, including: Alston International Inc. DBA Alston Asset Management Cathay bank account ending in 5850 ("Alston Cathay Account 5850") and Alston International Inc., DBA Alston Asset Management Chase bank account ending in 2768 ("Alston Chase Account 2768").

    e. The Alston entities operated out of the Irvine warehouse.

13. *Aluminum Shapes, LLC*

    a. Aluminum Shapes is a privately held New Jersey company.

    b. In or about December 2012, Shao, on behalf of Global, purchased Aluminum Shapes.

    c. As of 2015, Aluminum Shapes was owned by Jacky Cheung ("Cheung"). Cheung has also served as Perfectus's Chief Executive Officer and registered agent since at least January 2017.

    d. Plaintiff alleges on information and belief that Aluminum Shapes was purchased, at least in part, for the purpose of melting Zhongtian Liu's

and Perfectus's stockpile of bogus aluminum "pallets" into useable aluminum, including aluminum extrusions, for sale in the United States.

14.  *Aluminicaste Fundición de Mexico*

    a.    In or around 2010, in anticipation of AD/CVD orders, Liu directed Eric Shen ("Shen") to build an aluminum manufacturing facility in Mexico. The resulting facility was named Alumninicaste Fundición de Mexico, also known as AGM Fundición ("Aluminicaste").

    b.    Aluminicaste was built on approximately 32 hectares of land in San José Iturbide in Mexico. Construction began in late 2010 or 2011 and was completed in late 2012 or early 2013.

    c.    Aluminicaste was controlled by beneficially owned by Liu. Until at least 2013, Aluminicaste was managed by Shen and, thereafter, by Zuopeng Liu.

## FACTS SUPPORTING FORFEITURE

15.    On May 7, 2019, a Grand Jury in this District returned an Indictment (a copy of which is attached as Attachment B) charging, among others, Perfectus and the Warehouse LLCs with executing a wide-ranging and complex conspiracy to defraud investors in a publicly-listed company, evade over $1.8 billion in AD/CVD duties owed to the U.S. Treasury and U.S. Customs and Border Protection ("CBP"), and move hundreds of millions of dollars through accounts in the U.S. to promote the investor fraud and evasion of AD/CVD duties. See *United States v. Perfectus Aluminum Inc., et al.*, CR 19-282-RGK (the "Criminal Case"). Perfectus was charged with violating 18 U.S.C. § 371 (Conspiracy); 18 U.S.C. § 1343 (Wire Fraud); 18 U.S.C. § 545 (Customs Fraud); and 18 U.S.C. §1956(a)(2)(A) (International Money Laundering) while the Warehouse LLCs were charged with violating 18 U.S.C. §§ 371, 1343, and 545. The allegations of the Indictment are incorporated herein.

16. Count One of the Indictment alleged that Perfectus and the Warehouse LLCs violated 18 U.S.C. § 371, in two ways, by conspiring: (1) to defraud the U.S., specifically CBP; and (2) to commit offenses against the U.S., namely, wire fraud, in violation of 18 U.S.C. § 1343; passing false and fraudulent papers through a customshouse, in violation of 18 U.S.C. § 545; and international promotional money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A).

17. Counts Two through Ten of the Indictment alleged that Perfectus and the Warehouse LLCs committed a wire fraud scheme to defraud investors in CZW's stock in violation of 18 U.S.C. § 1343 and aided and abetted each other in violation of 18 U.S.C. § 2(a).

18. Counts Eleven through Seventeen of the Indictment alleged that Perfectus and the Warehouse LLCs committed customs fraud by evading payment of $1.8 billion in AD/CVD duties owed to CBP and the U.S. Treasury through the submission of false Forms 7501 to CBP in violation of 18 U.S.C. § 545 and aided and abetted each other in violation of 18 U.S.C. § 2.

19. Counts Eighteen through Twenty-Four of the Indictment alleged that Perfectus committed international promotional money laundering by moving hundreds of millions of dollars through accounts in the U.S. to promote the investor fraud and evasion of AD/CVD duties in violation of 18 U.S.C. § 1956(a)(2)(A) and aided and abetted each other in violation of 18 U.S.C. § 2.

*Purchase and maintenance of the defendant real property with funds transmitted from Hong Kong to the United States*

20. Scuderia Development LLC received funds through international wire transfers from suspected shell companies with bank accounts based in Hong Kong for the purpose of purchasing the four warehouses. The warehouses were used to

store aluminum extrusions, and later aluminum extrusions welded into the shape of aluminum pallets, in furtherance of the charged wire and customs fraud scheme.

*Purchase of the Riverside Warehouse*

21. In 2014, at the direction of Zhongtian Liu, the 600,000 square foot Riverside Warehouse was purchased using funds housed at a Cathay bank account in the name of Scuderia Development LLC ending in 5116 ("Scuderia Cathay Account 5116"). The property was purchased for approximately $43.5 million with funds received from Hong Kong shell companies controlled by Liu and his associate, Zhaohua Chen. Between October 10, 2014 and October 17, 2014, the Scuderia Cathay Account 5116 received approximately $44.99 million in funds from Hong Kong shell accounts. On or about October 29, 2014, the balance of $42.8 million in funds due for the purchase of the Riverside Warehouse was transferred by wire out of the Scuderia Cathay Account 5116.

*Examples of Maintenance of the Perfectus Warehouses*

22. In order to pay for the expenses associated with the four warehouses, Alston Asset Management would invoice Aluminicaste on a regular basis between 2015 and 2017. Those funds would then be used to pay for the operating and overhead expenses associated with the four warehouses, including property taxes, utilities, landscaping, and other maintenance expenses. Between May 2015 and September 2017, the Alston Cathay Account 5850 and Alston Chase Account 2768 Accounts received at least approximately $29 million from accounts in Mexico in the name of Aluminicaste.

   *2015 Maintenance*

23. For example, on or about September 1, 2015, Alston Asset Management located at the Irvine warehouse invoiced Aluminicaste for "Warehousing and Distribution" for the period of August 1, 2015 to August 31, 2015. The invoice included charges for each of the four warehouses and within each warehouse charge there were three line-items: (1) Base Rent Amount; (2)

1  Handling IN pallets (with pallet count and per pallet cost); and (3) Handling OUT
2  pallets (with pallet count and per pallet cost).  The total invoiced amount for all
3  four warehouses for this period was $1,327,224.60 ($261,719.10 for the Ontario
4  Warehouse; $560,736 for the Fontana Warehouse; $288,000 for the Riverside
5  Warehouse; $216,769.50 for the Irvine Warehouse).  On September 4, 2015,
6  Alston International Inc. DBA Alston Asset Management Cathay bank account
7  ending in 5850 ("Alston Cathay Account 5850") received $1,327,224.60 from an
8  Aluminicaste bank account in Mexico.
9       24.   On or about November 4, 2015, Alston Asset Management located at
10 the Irvine warehouse invoiced Aluminicaste for "Warehousing and Distribution"
11 for the period of November 1, 2015 to November 30, 2015.  The invoice included
12 charges for each of the four warehouses and within each warehouse charge there
13 were three line-items: (1) Base Rent Amount; (2) Handling IN pallets (with pallet
14 count and per pallet cost); and (3) Handling OUT pallets (with pallet count and per
15 pallet cost).  The total invoiced amount for all four warehouses for this period was
16 $1,389,224.60 ($261,719.10 for the Ontario Warehouse; $560,736 for the Fontana
17 Warehouse; $348,000 for the Riverside Warehouse; $218,769.50 for the Irvine
18 Warehouse).  On November 10, 2015, Alston International Inc., DBA Alston Asset
19 Management Chase bank account ending in 2768 ("Alston Chase Account 2768")
20 received $1,389,224.60 from an Aluminicaste bank account in Mexico.  For
21 December 2015, Alston Asset Management recorded $1,389,224.60 in income for
22 the four warehouses, all of which derived from Aluminicaste.
23      25.   On or about November 10, 2015, Alston Asset Management located at
24 Irvine Warehouse invoiced Aluminicaste for "Warehousing and Distribution" for
25 the period of December 1, 2015 to December 31, 2015.  The invoice included
26 charges for each of the four warehouses and within each warehouse charge there
27 were three line-items: (1) Base Rent Amount; (2) Handling IN pallets (with pallet
28 count and per pallet cost); and (3) Handling OUT pallets (with pallet count and per

pallet cost).   The total invoiced amount for all four warehouses for this period was $1,389,224.60 ($261,719.10 for the Ontario Warehouse; $560,736 for the Fontana Warehouse; $348,000 for the Riverside Warehouse; $218,769.50 for the Irvine Warehouse).  On November 10, 2015, Alston Chase Account 2768 received $1,389,224.60 from an Aluminicaste bank account in Mexico.  For November 2015, Alston Asset Management recorded $1,389,224.60 in income for the four warehouses, over 99% of which derived from Aluminicaste.  In that same month, Alston Asset Management recorded $159,053.65 in expenses for the warehouses including $179,021.74 in property taxes.

26.   In 2015, Alston Asset Management recorded over $14 million dollars in "Total Income" on their January to December 2015 Profit and Loss statement for the four warehouses.  Approximately $10 million was attributed to "Rent Revenue" and approximately $4 million was attributed to "Other Revenues" which included the "Handling of Pallets – In" and "Handling of Pallets – Out".  In that same period, the expenses recorded totaled approximately $3.8 million, including, but not limited to, "Shipping, Freight, and Delivery" for approximately $987,000, "Utilities" for approximately $240,000 thousand, "Building Upgrades" for approximately $473,000, "Lot and Landscape" for approximately $480,000, "Property Taxes" for approximately $1 million, and "General Administrative Expenses" for approximately $70,000.   In 2015, Alston Asset Management recorded approximately $10 million in Net Operating Income for the four warehouses.

*2016 Maintenance*

27. Alston continued to invoice Aluminicaste in 2016 related to the four warehouses. For instance, on or about March 1, 2016, Alston Asset Management located at Irvine Warehouse invoiced Aluminicaste for the period of March 2016. The invoice included charges for each of the four warehouses and within each warehouse charge there were three line-items: (1) Base Rent Amount; (2) Handling IN pallets (with pallet count and per pallet cost); and (3) Handling OUT pallets (with pallet count and per pallet cost). The total invoiced amount for all four warehouses for this period was $1,389,224.60 ($261,719.10 for the Ontario Warehouse; $560,736 for the Fontana Warehouse; $348,000 for the Riverside Warehouse; $218,769.50 for the Irvine Warehouse). On March 4, 2016, Alston Chase Account 2768 received $1,489,224.60 from an Aluminicaste bank account in Mexico. The extra $100,000 was attributable to rent invoiced on a Liu personal family residence.

28. At some point in time, the description on the invoices changed from rent and handling pallets in/out, to consulting revenue. For instance, on or about August 1, 2016, Alston Asset Management located at the Irvine Warehouse invoiced Aluminicaste for the month of August 2016. The total invoiced amount was $610,000 ($105,000 for the Ontario Warehouse; $265,000 for the Fontana Warehouse; $135,000 for the Riverside Warehouse; and $105,000 for the Irvine Warehouse). On August 5, 2016, Alston Chase Account 2768 received $670,000 from an Aluminicaste bank account in Mexico. The extra $60,000 was attributable to rent invoiced to Aluminicaste for rent on a Liu personal family residence.

29. In 2016, on the Alston Consolidated Property Profit and Loss Statement, approximately $12 million dollars was recorded for "Total Income", which included approximately $12 million in "Consulting Revenue" from "1001 Doubleday, LLC", "10681 Production Avenue, LLC", "Von Karman-Main Street LLC", and "14600 Innovation Drive". The expenses recorded in the same period

totaled approximately $3 million including, but not limited to, "HVAC" for approximately $13,000, "Landscaping" for approximately $122,000, "Security and Alarms" for approximately $31,000, "Utilities" for approximately $320,000, "Property Tax" for approximately $2 million, "Professional Fees" for approximately $100,000, and "Insurance Expense" for approximately $128,000. In 2016, Alston recorded approximately $9 million in Net Income.

*2017 Maintenance*

30. In 2017, Alston Asset Management continued to invoice Aluminicaste related to the four warehouses. For instance, in January 2017, Alston Asset Management located at the Irvine Warehouse invoiced Aluminicaste for the period of January 2017. The invoice included consulting charges each of the of the four warehouses for a total of $610,000 ($105,000 for the Ontario Warehouse; $265,000 for the Fontana Warehouse; $135,000 for the Riverside Warehouse; and $105,000 for the Irvine Warehouse). On January 6, 2017, Alston Chase Account 2768 received $670,000 from an Aluminicaste account in Mexico. Between January and May 2017, Alston Chase Account 2768 received over $5 million from Aluminicaste accounts in Mexico.

*The warehouses were used to promote the wire and customs fraud schemes of which Perfectus and Warehouse LLCs were convicted*

31. As part of the charged wire fraud scheme, to create the appearance that CZW's aluminum sales to the U.S. were legitimate and that the "pallets" were finished merchandise, Liu used the Warehouse LLCs to purchase four warehouses, including the defendant real property, to stockpile and conceal the aluminum. In addition, to further the charged wire and customs fraud schemes, Liu and CZW caused CZW's annual reports to make numerous material false statements to and omitted material facts from its investors regarding CZW's revenue, US exports, related party transactions, CZW's financing of its own aluminum sales, connection

to the Perfectus, and the demand for aluminum "pallets". Lacking legitimate buyers for the aluminum "pallets", and to keep the charged wire and customs fraud schemes going, Liu and CZW directed Perfectus to purchase the extrusions and pallets, which were ultimately stored at the warehouses owned by the Warehouse LLCs (including the defendant real property) as well as at Liu's New Jersey facility.

*Criminal Conviction of Perfectus and the Warehouse LLCs*

32. On August 23, 2021, in the Criminal Case, Perfectus was convicted on all counts (18 U.S.C. § 371 – Conspiracy; 18 U.S.C. § 1343 – Wire Fraud; 18 U.S.C. § 545 – Customs Fraud; and 18 U.S.C. §1956(a)(2)(A) – International Money Laundering) while the Warehouse LLCs were convicted on all counts for which they were charged, namely 18 U.S.C. § 371 – Conspiracy; 18 U.S.C. § 1343 – Wire Fraud; and 18 U.S.C. § 545 – Customs Fraud.

## CLAIM FOR RELIEF

33. Based on the facts set out above, plaintiff alleges that the defendant real property was involved in one or more violations of 18 U.S.C. § 1956(a)(2)(A) (International Money Laundering), done with the intent to promote the underlying specified unlawful activity for which Perfectus and the Warehouse LLCs were convicted, namely violations of 18 U.S.C. §§ 1343 (Wire Fraud) and 545 (Customs Fraud), thus rendering the Warehouses subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

//
//

WHEREFORE, plaintiff United States of America prays:

(a)   that due process issue to enforce the forfeiture of the defendant real property;

(b)   that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c)   that this Court decree forfeiture of the defendant real property to the United States of America for disposition according to law; and

(d)   that this Court order such other and further relief as the Court may deem just and proper, together with the costs and disbursements of this action.

DATED: September 22, 2021

TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

    /s/ Jonathan Galatzan
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## VERIFICATION

I, Tennyson J. Martinez, hereby declare that:

1.  I am a Special Agent with the U.S. Department of Homeland Security, United States Immigration and Customs Enforcement, Homeland Security Investigations and am the case agent for the forfeiture matter entitled *United States of America v. Real Property Located at 14600 Innovation Drive, Riverside, California*.

2.  I have read the above Verified First Amended Complaint for Forfeiture *In Rem* and know its contents. It is based upon my own personal knowledge and reports provided to me by other law enforcement agents.

3.  Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed September 22, 2021 in Los Angeles, California.

　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　TENNYSON J. MARTINEZ

## ATTACHMENT A

The following described real property (the "Property") located in the jurisdiction of the March Joint Powers Authority, in the County of Riverside, State of California:

LOTS 5 AND 6 OF TRACT NO. 30857-1 IN THE UNINCORPORATED TERRITORY OF THE COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS PER MAP FILED IN BOOK 371, PAGES 20 THROUGH 38 INCLUSIVE OF MAPS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY

EXCEPTING: ALL RIGHT, TITLE, AND INTEREST IN THE OIL, GAS AND OTHER MINERALS THAT MAYBE TAKEN, SAVED, PRODUCED OR EXTRACTED FROM THE PROPERTY; AND GRANTOR DOES HEREBY WAIVE, FOR ITSELF AND ITS SUCCESSORS AND ASSIGNS, ITS RIGHTS TO USE THE SURFACE OF THE PROPERTY FOR EXPLORING, DRILLING, PRODUCING, OR ANY OTHER ACTIVITY IN CONNECTION WITH SAID RESERVED MINERAL INTERESTS BUT SHALL RESERVE, FOR ITSELF AND ASSIGNS, THE RIGHT TO DEVELOP AND PRODUCE SUCH OIL, GAS AND OTHER MINERALS BY POOLING OR BY DIRECTIONALLY OR HORIZONTALLY DRILLING FROM SURFACE SITES LOCATED ON OTHER LANDS, PROVIDED THAT UNDER NO CIRCUMSTANCES SHALL THERE BE ANY PENETRATIONS ONTO THE SURFACE OF PROPERTY AND FURTHER PROVIDED THAT NO PENETRATION OF THE SUBSURFACE MAY BE MADE AT A DEPTH WHICH IS LESS THAN 200 FEET BELOW THE SURFACE OF THE PROPERTY AND THAT UNDER NO CIRCUMSTANCE MAY GRANTOR DISTURB OR INTERFERE WITH ANY ABOVE SURFACE OR SUBSURFACE BUILDINGS OR IMPROVEMENTS LOCATED ON THE PROPERTY, AS RESERVED IN DEEDS RECORDED MARCH 22, 2012 AS INSTRUMENT NO. 2012-0133673 OF OFFICIAL RECORDS.

TAX ID: 297230031-7